

FILED & JUDGMENT ENTERED
Steven T. Salata

January 24 2017

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Charlotte Division)

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **JEFF BENFIELD NURSERY, INC.,** | ) | Case No. 16-40375 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## ORDER DENYING MOTION FOR RELIEF FROM AUTOMATIC STAY

This cause came before the Court on December 13, 2016, for a final hearing on the *Motion for Relief from the Automatic Stay and Request for Interim Hearing Under Section 362(e) of the Bankruptcy Code* filed by SiteOne Landscape Supply, Inc. ("SiteOne"). [Doc. 71].[1] David A. Wender, Esq. appeared for SiteOne; Constance L. Young, Esq. appeared for PNC Bank, N.A. ("PNC"); Felton E. Parrish, Esq. appeared for Century Services LP ("Century"); James M. Sullivan, Esq. appeared for the Internal Revenue Service; Richard S. Wright, Esq. appeared for Jeff Benfield Nursery, Inc. (the "Debtor"); and Linda W. Simpson, Esq. appeared as the United States Bankruptcy Administrator for the Western District of North Carolina. Based upon a review of the record, the evidence presented, and the arguments of counsel, the Court makes the following:

---

[1] SiteOne invoked the timing provisions of section 362(e) of the Bankruptcy Code. After a preliminary hearing on November 14, 2016, the Court continued the automatic stay in effect pending the conclusion of the final hearing. *See Order Regarding Preliminary Stay Relief Hearing Under 11 U.S.C. § 362(e)*. [Doc. 115].

## FINDINGS OF FACT[2]

The Debtor operates a commercial wholesale nursery, growing trees, shrubs, and similar agricultural products on approximately 1,000 acres in western North Carolina. The Debtor filed for protection under Chapter 11 of the Bankruptcy Code in this Court on August 26, 2016. PNC asserts a secured claim in the Debtor's bankruptcy case of approximately $6.1 million, alleging a perfected pre-petition security interest in substantially all assets of the Debtor, including, but not limited to, its accounts, inventory, equipment, and farm products – including crops. Similarly, Century asserts a secured claim against the estate of approximately $540,000. Century alleges that it too has a valid pre-petition lien in all assets of the Debtor, including crops, and that its security interest is superior in priority to that of PNC.

On or about October 28, 2013, the Debtor entered into a "Contract Grow Agreement" with Shemin Nurseries, Inc., a wholesale distributor of nursery stock ("Shemin") (as subsequently amended on March 17, 2014 and February 1, 2016, the "2013 Agreement"). The Debtor entered into a second "Contract Grow Agreement" with Shemin on or about April 9, 2015 (as subsequently amended on February 1, 2016, the "2015 Agreement"). Pursuant to both the 2013 Agreement and the 2015 Agreement, the Debtor was to plant and grow designated varieties and quantities of trees for Shemin on two tracts of leased land (the "Contract Farms"), in return for certain fees over two separate, four-year terms. SiteOne asserts that it subsequently acquired Shemin, and is its successor in interest under the 2013 Agreement and the 2015 Agreement (jointly, when applicable, the "Grow Contracts").

The Grow Contracts are governed by North Carolina law according to their express terms. They provide that SiteOne shall purchase and deliver trees to be planted on the Debtor's

---

[2] The Court's findings and conclusions in this Order are for purposes of the Stay Relief Motion only. The validity and extent of the interest in the trees at issue will be determined on a final basis in the related Adversary Proceeding discussed below.

leased properties. The Grow Contracts also state that the trees, in specified sizes and quantities, will be harvested in the spring and fall of each year according to harvest schedules set forth as exhibits thereto.

After the trees are planted, SiteOne is to pay a "Planting Cost" to the Debtor to account for the costs of purchasing and planting the trees on the leased properties. The Planting Cost is determined by schedules attached to the Grow Contracts, which in some instances include royalties for particular species in addition to predetermined liner[3] and planting expenses. During the cultivation of the trees, SiteOne is to pay a "Maintenance Cost" to the Debtor. The Maintenance Cost, which is to be invoiced and paid three times per year on a pre-determined schedule, is a set fee calculated according to how many trees remain in-ground, less any trees that have been culled by SiteOne. The Grow Contracts define a "Culled Unit" as a tree that is not accepted by SiteOne due to death, immaturity, or failure to meet SiteOne's quality or pruning standards.

Once harvesting of the trees occurs, the Grow Contracts state that SiteOne shall pay the Debtor a "Final Cost," consisting of a pre-determined, below-market price per tree, less the Planting Costs and Maintenance Costs previously paid to the Debtor for the trees in the harvest, and less a "Culled Credit" prorated over the number of trees accepted in the particular harvest. The Grow Contracts define the "Culled Credit" as follows:

> With respect to a particular Harvest, an amount equal to the sum of the Liner Cost, Planting Cost and cumulative Maintenance Cost incurred by Shemin for all Culled Units of the Planting and Cultivar of the Harvest; less (1) any insurance proceeds or other cash reimbursement actually received by Shemin for any Culled Units of the same Planting and Cultivar; and (2) any Culled Credit previously applied to a Harvest of the same Planting and Cultivar.

---

[3] A "liner" is an immature tree, which is grown in the nursery to a saleable size.

In addition to the foregoing, the Grow Contracts require that at the end of their four-year terms, the Debtor must repay SiteOne an amount equal to all Planting Costs (including, but not limited to, the liner costs of the planted trees) and all Maintenance Costs incurred by SiteOne, but not already applied towards post-harvest Final Costs, unless the same are reimbursed to SiteOne through insurance or otherwise.

 Further, the Grow Contracts contain the following additional terms and conditions:

(a)   That SiteOne shall unilaterally purchase and deliver trees to the Debtor to be grown on the leased properties;

(b)   That SiteOne shall unilaterally determine the type and quantities of trees to be grown on the leased properties;

(c)   That SiteOne shall unilaterally determine the timing of the delivery of trees to be grown by the Debtor on the leased properties;

(d)   That SiteOne is not obligated to accept or compensate the Debtor for quantities of trees that exceed those set forth on the specific harvest schedules attached as exhibits to the Grow Contracts;

(e)   That the Debtor may not amend, modify or terminate the underlying real property leases without SiteOne's prior, written, discretionary consent;

(f)   That the trees will be grown according to SiteOne's unilaterally determined standards of grade, quality, and pruning;

(g)   That the Debtor will follow SiteOne's unilateral instructions regarding the maintenance and pruning of the trees;

(h)   That the Debtor will insure the trees to be grown under the Grow Contracts;

(i)   That the Debtor will be responsible for all permits, licenses, fees, charges, assessments, taxes, and inspections required by any governmental authorities in connection with the Debtor's performance of its obligations under the Grow Contracts;

(j)   That if the Debtor does not meet its obligations under the Grow Contracts, SiteOne may contract for such services on the Debtor's behalf and deduct the related costs of doing so from payments otherwise due to the Debtor under the Grow Contracts;

4

(k) That the Debtor shall provide SiteOne with access to the leased properties at all times, and shall not impede or impair SiteOne's performance of any activities related to the Grow Contracts;

(l) That SiteOne may, at its sole discretion, conduct a physical audit of the trees at any time without notice to the Debtor;

(m) That SiteOne may unilaterally dictate what nursery products can and cannot be grown on the leased properties during the terms of the Grow Contracts;

(n) That if, at the time of harvest and delivery, the Debtor cannot provide from the leased properties and/or from other locations the requested number and size of trees meeting SiteOne's grade, quality, and pruning standards, then SiteOne shall not be obligated to accept and pay the Debtor for trees in excess of the size and quantities that SiteOne is committed to accept at that time as set forth on the applicable harvest schedule;

(o) That title to the trees on the leased properties shall remain in SiteOne; and

(p) That SiteOne can, without prior notice to the Debtor, file such financing statements as it may deem necessary to protect its purported claim of title to the trees.

During the terms of the Grow Contracts, SiteOne filed three "financing statements" with the North Carolina Secretary of State. Each financing statement announces that it is a "Non-UCC Filing," that the relationship between SiteOne and the Debtor is that of "Bailee/Bailor," and that SiteOne is the "owner" of the collateral (consisting of various species of trees grown on certain land) rather than the holder of a security interest. There is no reference in the Grow Contracts to the creation of a security interest in the trees under Article 9 of the Uniform Commercial Code as adopted in North Carolina. Additionally, SiteOne did not at any time send an authenticated notification to PNC or Century stating that SiteOne had or expected to acquire a purchase-money security interest in the Debtor's inventory, or a production-money security interest in the Debtor's crops.

5

SiteOne sought relief from the automatic stay, alleging: (a) that the Debtor waived the protections of the stay in the Grow Contracts; (b) that SiteOne is the owner of the trees planted pursuant to the Grow Contracts, such that it is a bailor of the goods while the Debtor is a bailee; and (c) that the Debtor has breached the terms of the Grow Contracts by failing to properly care for the trees. The Debtor and PNC, which asserts that its blanket lien extends to the trees grown on the Contract Farms, objected to the stay relief motion. [Docs. 71, 98]. They argue SiteOne's assertion of title to the disputed crops is incorrect, and that the Grow Contracts are financing arrangements governed by the Uniform Commercial Code (the "UCC") rather than bailment agreements. Further, they contend that any interest SiteOne or other creditors may claim in the disputed goods is adequately protected so that there is no cause to grant relief from the automatic stay.

## CONCLUSIONS OF LAW

*A.     The Alleged Pre-Petition Waiver of the Stay is Unenforceable*

SiteOne first asserts that stay relief is warranted because the Debtor waived the protections of the automatic stay in the language of the pre-petition Grow Contracts. The cited language from section 18 the Grow Contracts is as follows:

> [I]f Benfield files for relief under Title 11 of the Bankruptcy Code, or is otherwise subject to an order for relief under the Bankruptcy Code:
>
> (a)     Shemin immediately thereupon shall be entitled to relief from the automatic stay imposed by Bankruptcy Code Section 362 on or against the exercise of any and all rights and remedies otherwise available to Shemin under this Agreement or applicable law. Benfield specifically acknowledges that "cause" exists for such relief within the meaning of Section 362(d) of the Bankruptcy Code, that Benfield does not own the Units and that the Units are not property of Benfield's bankruptcy estate and are not needed for reorganization of Benfield.

Courts have taken a variety of approaches to such pre-petition stay waivers, emphasizing either the encouragement of out-of-court settlements on one hand, or the countervailing concerns

6

of promoting reorganization and equality among creditors on the other. *See In re Atrium High Point Ltd. Partnership*, 189 B.R. 599, 605-06 (Bankr. M.D.N.C. 1995) (collecting cases). However, this Court concludes that such provisions, which effectively render the automatic stay meaningless, are unenforceable as a matter of public policy. Upholding pre-petition waivers of this sort deprives debtors of the "breathing spell" contemplated by the Bankruptcy Code and thwarts the congressional intent underlying imposition of the automatic stay. "[P]repetition agreements purporting to interfere with a debtor's rights under the Bankruptcy Code are not enforceable." *In re Intervention Energy Holdings, LLC*, 553 B.R. 258, 263 (Bankr. D. Del. 2016) (citing *MBNA Am. Bank, N.A. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 275 B.R. 712, 723 (Bankr. D. Del. 2002)). "[I]t would defeat the purpose of the Code to allow parties to provide by contract that the provisions of the Code should not apply." *Id.* (citing *In re 203 N. LaSalle St. P'ship*, 246 B.R. 325, 331 (Bankr. N.D. Ill. 2000)).

Further, the Court concludes that even those courts that have enforced pre-petition waivers in certain circumstances would decline to do so here. Those courts consistently observe that such provisions are not automatic or self-executing, and analyze the facts and circumstances of each case to determine whether the waiver should be upheld. "[S]uch agreements must be strictly construed in light of the contractual language and the associated circumstances." *In re Riley*, 188 B.R. 191, 192 (Bankr. D.S.C. 1995) (declining to enforce waiver provision in forbearance agreement). As further stated by the South Carolina Bankruptcy Court:

> "[P]re-petition agreements containing waivers of stay are not automatic or self-executing. [*In re Powers*, 170 B.R. 480, 483 (Bankr. D. Mass. 1994)]. A pre-petition agreement involving a waiver is a primary element in determining if cause exists for relief from the stay. Once the pre-petition waiver has been established, the burden is on opposing parties to demonstrate that it should not be enforced. *Powers*, at p. 484. In *Powers*, the Court examined such factors as the benefit the debtor received from the workout agreement, the loss of consideration or potential prejudice to the creditor if waiver is not enforced, the

7

effect of enforcement on other creditors and whether there appears to be a likelihood of successful reorganization.

*In re Darrell Creek Assocs., LP*, 187 B.R. 908, 912 (Bankr. D.S.C. 1995). *See also Massachusetts Mut. Life Ins. Co. v. Shady Grove Tech Ctr. Assocs. Ltd. P'shp. (In re Shady Grove Tech Ctr. Assocs. Ltd. P'shp)*, 227 B.R. 422, 425 (Bankr. D. Md. 1998) (identifying similar factors for consideration).

The purported waiver in this case was a single term in a much broader agreement dealing with an entirely different subject matter. It does not appear that there was any bargained-for exchange with respect to the waiver language. Likewise, the Debtor did not receive significant consideration in return for its inclusion, as might be the case in a more specific forebearance agreement. The Debtor has also submitted valuation evidence showing there is substantial equity in the estate (even excluding the crops located on the Contract Farms), indicating that there is a reasonable prospect of reorganization within a reasonable timeframe. Finally, enforcing a stay waiver in this context would also negatively impact other creditors, particularly those secured creditors asserting blanket liens on all of the Debtor's assets. Thus, while the Court reiterates that it deems such waivers *per se* unenforceable, its conclusion is buttressed by the factors analyzed by other courts when confronted with similar contractual provisions.

### B. *Applicable Standards for Considering Whether to Lift the Automatic Stay*

Section 362(d) of the Bankruptcy Code allows the Court to grant relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest. . . ." 11 U.S.C. § 362(d)(1). The Bankruptcy Code does not provide a "definition of what constitutes 'cause,' [therefore,] courts must determine when discretionary relief is appropriate on a case-by-case basis." *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992). To determine that "cause" exists, "[t]he court must balance potential prejudice to the bankruptcy

Case 16-40375 Doc 182 Filed 01/24/17 Entered 01/24/17 15:43:06 Desc Main
Document Page 9 of 19

debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." *Id*.

To establish a *prima facie* case for relief from the stay, the moving party must show that the debtor owes the moving party a debt or obligation, that the moving party has an interest in the collateral securing that debt, and that the value of that collateral is declining. *See In re Carroll*, 2012 Bankr. LEXIS 1164, *5-6 (Bankr. E.D.N.C. March 12, 2012) ("The moving party must show '[t]he [d]ebtor owes a debt to it, that it possess a valid security interest securing the debt, and that the collateral securing the debt is declining in value . . . ."). Moreover, while relief from the automatic stay may be appropriate to protect a party's "interest" in property, it is first and foremost "the nature of the movant's interest [that] defines the need for adequate protection" under section 362(d)(1). *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y 1994).

Accordingly, a determination as to the nature of SightOne's interest must be made in the summary process of a hearing on a motion for relief from stay. At the same time, the parties seek a final determination of their interests, including SightOne's, in an Adverary Proceeding. Given the applicable standards and timing, this order should not be read to prejudice any party's rights in the Adversary Proceeding. Rather, this ruling is solely for the purpose of determining whether SightOne should be entitled to relief from stay.

C.     *The Grow Contracts Do Not Create a Bailment*

SiteOne next contends that, having reserved title to the trees in the Grow Contracts, it entered into a bailor-bailee relationship with the Debtor. If so, the Debtor arguably would have been unable to grant security interests in the crops on the Contract Farms to its other secured lenders. SiteOne, as the purported bailor, has the burden of proving that such a bailment relationship exists. *See Mid-South Invs., LLC v. Statesville Flying Serv.*, 2016 U.S. Dist. LEXIS

9

96249, *22 (W.D.N.C. July 22, 2016); *Flexlon Fabrics, Inc. v. Wicker Pick-Up and Delivery Service, Inc.*, 39 N.C. App. 443, 447 (1979).  Under North Carolina law, a bailment is created "upon the delivery of possession of goods and the acceptance of their delivery by the bailee." *Mid-South Invs.,* 2016 U.S. Dist. LEXIS 96249 at *22 (citing *Atl. Contr. & Material Co. v. Adcock*, 161 N.C. App. 273 (2003)).  In order to "deliver" property, the bailor must relinquish "exclusive possession, custody, and control to the bailee." *Id.*  Thus, the critical question in this analysis is the degree of control exercised by the purported bailee over the purported bailor's property. *Id.*

In *Mid-South Investments*, the plaintiff asserted that it was the bailor of an airplane stored by the defendant.  The District Court disagreed, finding that a bailment did not exist because the purported bailee never had exclusive possession, custody, and control of the aircraft.  The plaintiff had the password to the keypad lock on the hangar and could access its airplane at any time without obtaining the defendant's permission.  The defendant, for its part, did not possess keys to the plane and did not assume any responsibility to maintain it.  *Mid-South Invs.,* 2016 U.S. Dist. LEXIS 96249 at *8.  On these facts, the Court held that the plaintiff failed to meet its burden to establish a bailor-bailee relationship. *Id.* at *22-23.

In the present case, the Debtor clearly had possession of the trees under the Grow Contracts, since they were planted on its leased property.  At the same time, SiteOne retained numerous, significant control rights.  For example, the trees had to be grown according to SiteOne's unilaterally determined standards.  The Debtor was to follow SiteOne's unilateral instructions regarding their maintenance and pruning.  If the Debtor did not meet those obligations, SiteOne had the right to contract for the services from third parties (both for itself and on the Debtor's behalf).  SiteOne had access to the leased premises at all times without the

10

need to obtain the Debtor's permission. SiteOne had the right, at its sole discretion, to conduct a physical audit of the crops at any time without notice to the Debtor. SiteOne also had the right to dictate what crops could and could not be grown on the leased premises.

Taken as whole, these provisions are incompatible with a finding of exclusive possession and control by the Debtor. Rather, the facts are indicative of shared control between the parties, with SiteOne having a greater degree of authority over the goods. Therefore, as in *Mid-South Investments*, this Court concludes that a bailment did not exist between SiteOne and the Debtor.[4]

### D. The Grow Contracts are Disguised Financing Arrangements

When viewed through the lens of the standard governing a motion brought under 11 U.S.C. § 362, the Court concludes that the Grow Contracts are in actuality disguised financing arrangements rather than a bailment agreement for services. The legal definition of a loan or financing arrangement under North Carolina law is based on a contractual relationship, whereby "one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 529 (1971) (quotations and citations omitted). Regardless of how parties may attempt to subjectively characterize their contractual relationship, "[t]he law considers the substance and not the mere form or outward appearance of the transaction in order to determine what it in reality is." *Id.* at 531 (quoting *Ripple v. Mortgage & Acceptance Corp.*, 192 N.C. 422, 424 (1927)).

---

[4] The Debtor also argues that a bailment requires the owner to entrust a bailee with specific property, and that the bailee must return that exact property to the owner. *See Powder Co. v. Burkhardt*, 97 U.S. 110, 118 (1877); *State v. Eurell*, 220 N.C. 519, 520 (1941) ("He is a bailee if … he is to return the identical money received, and debtor if he is to use the money and return its equivalent on demand."). *See also Welding Metals v. Foothill Capital Corp.*, 1997 U.S. Dist. LEXIS 7672, *25 (D. Conn. April 14, 1997) ("whether a bailment exists is determined by whether the identical article delivered is to be returned to the party making the advance.") The Grow Contracts provide, "if, at the time of harvest and delivery, the Debtor cannot provide from the leased properties ***and/or from other locations*** the requested number and size of trees … then SiteOne shall not be obligated to accept and pay the Debtor for trees …." While not necessarily determinative of the issues before the Court, this term of the Grow Contracts allowing the Debtor to fill orders with crops from other locations also contradicts SiteOne's assertion that the Debtor is merely a bailee of goods.

Because the law is concerned with the substance rather than the form of a transaction, courts have found that loans disguised as other types of contracts are really just financing arrangements. *See*, *e.g.*, *Pro Page Partners, LLC v. Message Express Paging Co. (In re Pro Page Partners)*, 270 B.R. 221, 233 (Bankr. E.D. Tenn. 2001) (holding that a purported "management contract" was really a financed sale of a business concern); *Cross v. Capital Transaction Grp., Inc.*, 191 N.C. App. 115, 122, 661 S.E.2d 778, 783 (2008) (holding that a "transaction constituted a loan, notwithstanding its facial disguise as the 'sale' of proceeds of workers' compensation 'litigation.'"). Indeed, on facts similar to those in the case at bar, courts have readily determined a financing arrangement existed where the creditor "finance[d] a debtor's operation by supplying *material* rather than *money* with which to buy materials." *Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank of Tulsa*, 705 F.2d 396, 399 (10th Cir. 1983) (emphasis added); *see Powder Co. v. Burkhardt*, 97 U.S. 110, 118 (1877) (advances of money and raw materials made to a manufacturer of explosive powder made the manufacturer a debtor for the cost of goods rather than a bailor of the materials).

Despite their complexity, the Grow Contracts similarly embody financing transactions. All of the costs of planting and maintaining the trees advanced to the Debtor must be repaid to SiteOne in the form of credits when the trees are finally harvested and sold to SiteOne. SiteOne ultimately purchases trees from the Debtor at the lesser of a capped cost for the particular variety of tree, or, the trees' market cost, less all amounts advanced to the Debtor as planting and maintenance fees and accrued cull credits. In this formula, the capped cost represents a deduction from the current market cost. This mechanism provides SiteOne with the equivalent of interest under a more traditional financing agreement. Additionally, at the end of the agreed

12

term, the Debtor is required to repay SiteOne all costs advanced for any trees it elects not to purchase.

The Grow Contracts allow SiteOne to provide financing to the Debtor for the acquisition of the Contract Farm stock, and for the Debtor's operational costs in planting and maintaining that stock. In return for this financing, SiteOne can purchase mature trees at prices it clearly anticipates will be lower than market rate. SiteOne also recoups all of its advanced costs, in the form of credits or cash payments, for the trees it does not purchase. All the while, the Debtor bears one-hundred percent of the risk of loss for the Contract Farm trees and must pay all related insurance costs, fees, and taxes. In substance, the Grow Contracts establish a financing arrangement whereby SiteOne delivers money to the Debtor, allowing the Debtor to conduct its operations, and the Debtor "agrees to return at a future time a sum equivalent to that which he borrows." *Kessing*, 278 N.C. at 529. Thus, the exchanges captured in the Grow Contracts constitute financed loans under North Carolina law.

### E.     *It Remains to be Determined Whether SiteOne Has a Perfected Security Interest*

The provisions of the UCC as adopted in North Carolina reinforce the conclusion that the Grow Contracts were, in reality, tools for extending financing. The UCC was drafted to comprehensively apply to commercial transactions, in order "[t]o avoid the dismal history under which legislatures drafted laws to govern security arrangements and clever lawyers routinely escaped the grasp of such laws by devising ingenious documents that suited their clients' needs but did not fit the statutory definitions." Brent G. Summers, *"Bailment for Processing": Article Nine Security Interest or Title Retention Contract*, 61 Or. L. Rev. 441, 447 (1982) (quoting J. White & R. Summers, *Uniform Commercial Code* § 25-2 (2d ed. 1980)).

In interpreting any commercial contract, the UCC:

13

> shall be liberally construed and applied to promote its underlying purposes and policies, which are: (1) To simplify, clarify, and modernize the law governing commercial transactions; (2) To permit the continued expansion of commercial practices through custom, usage, and agreement of the parties; and (3) To make uniform the law among the various jurisdictions.

N.C. Gen. Stat. § 25-1-103 (2015). Modern courts that encounter commercial arrangements similar to the Grow Contracts consistently apply the UCC in their analyses of the transactions and the parties' relative rights. *See*, *e.g.*, *GMAC Bus. Credit*, 100 Fed. Appx. 404 (6th Cir. 2004); *Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank of Tulsa*, 705 F.2d 396 (10th Cir. 1983); *Clean Burn Fuels, LLC v. Perdue BioEnergy, LLC (In re Clean Burn Fuels, LLC)*, 492 B.R. 445 (Bankr. M.D.N.C. 2013); *Litwiller Machine & Mfg., Inc. v. NBD Alpena Bank*, 144 Mich. App. 369, 374 (1990); *Morton Booth Co. v. Tiara Furniture, Inc.*, 564 P.2d 210 (Okla. 1977).

The UCC eschews the concept of "title" as determinative of the rights of parties to a commercial agreement. N.C. Gen. Stat. § 25-9-202 ("Except as otherwise provided with respect to consignments or sales of accounts, chattel paper, payment intangibles, or promissory notes, the provisions of this Article with regard to rights and obligations apply whether title in collateral is in the secured party or the debtor."). The drafters of the UCC took this step with the intention "that its provisions should not be circumvented by manipulation of the locus of title." *Litwiller Machine & Mfg., Inc. v. NBD Alpena Bank*, 144 Mich. App. 369, 374 (1990) (quoting *James Talcott, Inc. v. Franklin Nat'l Bank*, 194 N.W.2d 775, 781 (Minn. 1972)).

Instead, Article 9 of the UCC applies to any "transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract . . . ." N.C. Gen. Stat. § 25-9-109(a)(1). The UCC defines a "security interest" as "an interest in personal property or fixtures which secures payment or performance of an obligation." N.C. Gen. Stat. § 25-1-201(33). The creation of such security interests does not rely on the subjective intention of the

14

parties—*"the subjective intention of the parties with respect to the legal characterization of their transaction is irrelevant to whether this Article applies . . . ."* N.C. Gen. Stat. § 25-9-109, Amended Official Comment (2010 ed.) n.2 (emphasis added). As explained by the Official Comments to the 2010 amendment of the UCC:

> As did former section 1-201, former article 9 referred to transactions, including leases and consignments, "intended as security." This misleading phrase created the erroneous impression that the parties to a transaction can dictate how the law will classify it (*e.g., as a bailment or as a security interest*) and thus affect the rights of third parties. This article deletes the phrase wherever it appears. Subsection (b) expresses the principle more precisely by referring to a security interest that "secures an obligation."

N.C. Gen. Stat. § 25-9-505 Amended Official Comment (2010 ed.) n.3 (emphasis added).

Under the UCC, a security interest will attach wherever (1) value is given to a debtor; (2) the debtor has rights in the collateral; and (3) the "debtor has authenticated a security agreement that provides a description of the collateral . . . ." N.C. Gen. Stat. § 25-9-203(b)(1)-(3). There is no requirement that the debtor have "title" or "full ownership rights" in the collateral. *Litwiller Machine & Mfg., Inc.*, 144 Mich. App. at 374 (citations omitted). To the contrary, "'where a debtor gains possession of collateral pursuant to an agreement endowing him with any interest other than naked possession, the debtor has acquired such rights as would allow the security interest to attach.'" *GMAC Bus. Credit v. Ford Motor Co. (In re H.S.A. II)*, 100 Fed. Appx. 404, 408 (quoting *Morton Booth Co. v. Tiara Furniture Inc.*, 564 P.2d 210, 214 (Okla. 1977) (alterations in original)). In the present case, the Debtor has an interest in the disputed collateral greater than mere naked possession. The Debtor actively maintains the collateral and is responsible for its transformation from liners to mature, harvestable trees on real property it has leased. The Debtor has the legal right to payment for its services, and as the Grow Contracts themselves evidence, the Debtor has an insurable and taxable interest in the collateral. As such,

15

the Debtor is not merely a bailee and has sufficient rights in the trees on the Contract Farms to grant security interests in them.

To be abundantly clear, however, the Court need not determine the exact nature and extent of the various parties' rights in the collateral at this juncture. Bankruptcy Rule 7001 explicitly requires an adversary proceeding for that purpose, and the Debtor and PNC have initiated a declaratory judgment action, Adversary Proceeding No. 16-03337 (the "Adversary Proceeding"), seeking a conclusive determination of those questions. For now, it is sufficient for the Court to conclude that SiteOne is not the owner and bailor of the goods in question, but instead may be the holder of a perfected security interest in them. Thus, SiteOne has a plausible interest in the trees. The Court makes this conclusion for purposes of deciding the current motion only. The Court is not determining the validity and extent of any interests in the Contract Farm trees on a final basis in this Order, and may reconsider its position on a fuller record in the referenced Adversary Proceeding if appropriate.

### F.     *SiteOne's Interest in the Collateral, If Any, Is Adequately Protected*

Section 362(d)(1) of the Bankruptcy Code allows the Court to grant relief from the automatic stay to a party whose interest is not adequately protected. 11 U.S.C. § 362(d)(1). In the context of a motion for relief from the automatic stay for cause, adequate protection means "protecting the secured creditor from any decrease in the value of the secured creditor's interest in the collateral caused by the imposition of the automatic stay." *In re Planned Sys., Inc.*, 78 B.R. 852, 861 (Bankr. S.D. Ohio 1987); *see also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 372 (1988) (stating same). Regardless of whether SiteOne is ultimately able to prove that it holds a properly perfected security interest in the disputed trees,

16

the Court concludes that its interest (and those of any other affected secured parties) is adequately protected in this case.

SiteOne asserted that the Debtor is not providing the trees with sufficient irrigation and is allowing excessive weed growth to damage the crops, which in turn adversely affects their value. SiteOne's evidence on these points, exclusively from its own employees, focused on weeds and dead bushes in an isolated area on one of the two Contract Farms, as well as bark damage on certain trees. However, the record is clear that the Debtor has decades of experience in the nursery industry and is a very good grower, despite its current financial troubles. The Debtor offered testimony from expert horticulture appraiser Gene Redlin and retired extension agent Craig Adkins. Mr. Redlin, who visited the Contract Farms on October 12 and 13, 2016, observed a "high level of excellence in growing practices." He stated that the Contract Farms were in good and marketable condition, were free from observable disease, and that weed control and pruning were done according to industry standards.

Mr. Adkins, a former North Carolina Agricultural Extension Agent with over 30 years of experience, made a similarly positive report after viewing the properties in early November of 2016. Mr. Adkins testified that the trees and shrubs on the Contract Farms showed "vigorous annual growth related to receiving ample water and fertilizer." He further noted that the stock was pruned and shaped according to nursery standards and that the plants were free of unwanted weeds. Mr. Adkins also testified that based on the characteristics of the bark damage he inspected, the same was caused by borers that infested certain trees prior to the time they were shipped to the Debtor from a grower in Oregon – rather than by any lack of care on the Debtor's part.[5]

---

[5] The borer damage girdled the lower tree trunk, rather than appearing only on the "sunny" side of the tree as is typical of such infestation in North Carolina. The borer damage also appeared to be several years old.

17

The Debtor's owner, Jeff Benfield, also testified regarding the company's irrigation, fertilization, and weeding practices. Mr. Benfield explained that weeds grew up on a one-half acre portion of one the Contract Farms because of the presence of poisonous copperhead snakes, which made clearing the area temporarily dangerous. These weeds, which were a central theme in SiteOne's evidentiary presentation, were removed days later once the snakes were dispatched. Mr. Benfield also noted that, in addition to the Debtor's irrigation of its crops with diesel pumps, western North Carolina received uncharacteristically large amounts of rainfall in late summer and early fall of 2016. The Court is familiar with the extraordinary weather experienced in the region during this period. While such wet conditions may have contributed to the loss of more trees than might ordinarily be expected in a given season, it is not evidence of a lack of care on the Debtor's part.[6]

Any additional allegations that the Debtor's current financial situation poses a threat to the crops' value are mitigated by the fact that the trees have now entered their dormant season and will require less maintenance over the coming winter months. Mr. Benfield also testified that the trees growing on the Contract Farms are estimated to increase by an average of 5% in the coming spring season and an additional 5% in the subsequent fall season. These increases in value are also reflected in the "Cost Cap Schedules" attached to the Grow Contracts, which show a steady rise in the dollar price cost cap for each plant variety growing on the Contract Farms. Since the record demonstrates that the Debtor has maintained the disputed trees and their value is increasing rather than decreasing, all of the creditors' competing interests in the property are

---

[6] The evidence showed that roughly 4,000 trees died, leaving approximately 51,000 of the original trees planted on the Contract Farms.

adequately protected. Therefore, the Court concludes there is no cause for stay relief, even if it is subsequently determined that SiteOne has an enforceable security interest.[7]

**WHEREFORE, IT IS ORDERED, ADJUDGED and DECREED that** SiteOne's *Motion for Relief from the Automatic Stay and Request for Interim Hearing Under Section 362(e) of the Bankruptcy Code* is hereby DENIED.

| This Order has been signed electronically. The Judge's signature and Court's seal appear at the top of this Order. | United States Bankruptcy Court |
|---|---|

---

[7] SiteOne also alleged that the Debtor breached the Grow Contracts by improperly replanting trees that died prior to their harvest with replacements from its other nursery stock, and failed to account for such "replants" in its maintenance invoices. The Debtor did not deny its practice of replanting, offered evidence that Shemin (SiteOne's predecessor) condoned the practice, and argued that the strict terms of the Grow Contracts in fact authorize it. The Court attributes the parties' differing viewpoints on replants to the ownership transition from Shemin to SiteOne. Regardless, these issues are not germane to the decision regarding the stay relief motion and the Court makes no findings on them either way for purposes of this Order.